UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 19-10059-RGS

UNITED STATES OF AMERICA

v.

DAVID ST. GEORGE

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO SUPPRESS

March 8, 2021

STEARNS, D.J.

Defendant David St. George is charged with distributing, receiving, and possessing child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A), and 18 U.S.C. § 2252A(a)(5)(B) and (b)(2). St. George seeks to suppress incriminating statements that he made to federal investigators during the execution of a search warrant on September 25, 2018, arguing that his waiver of his *Miranda* rights was not voluntary under the circumstances.[1] The court held an in-person evidentiary hearing on September 22, 2020, and

---

[1] St. George initially premised his motion to suppress on a violation of *Missouri v. Seibert*, 542 U.S. 600 (2004) (*plurality opinion*), a case in which a plurality of the Supreme Court criticized the "question first, warn later" interrogation technique, a method intended to undermine the *Miranda* warnings by leading a defendant to believe that with the "cat out of the bag," there was no point in his not continuing to talk. *Id*. at 616-617. In his post hearing brief, St. George essentially waives the argument. Def.'s Mem. (Dkt # 81) at 14.

heard testimony from the investigators and St. George. Following the hearing, the court gave leave to the parties to file proposed findings of fact and conclusions of law. Briefing now completed, the court will deny the motion to suppress.

Based on the credible testimony and exhibits offered into evidence, I find the following material facts.

1. Just before sunrise, at 6:12 a.m. on September 25, 2018, eleven agents of Homeland Securities Investigations (HSI), the investigative arm of the U.S. Department of Homeland Security, arrived at defendant St. George's home in Arlington, Massachusetts escorted by three or four Town of Arlington police officers, prepared to execute a search warrant.[2] The team was led by HSI Special Agent Connolly. After knocking and announcing their presence several times without a response, three HSI officers and a uniformed Arlington police officer entered through a side door found by HIS Special Agent Defreitas to be unlocked. The door opened onto the kitchen of the home. There they encountered a "surprised" St. George dressed in his bathrobe. Tr. at 78, 100. St. George testified that when he awoke to hear the police knocking just after 6:00 a.m., he assumed that a taxi driver with whom he had scheduled a 6:45 a.m. pickup had mistakenly arrived

---

[2] Two of the agents (Janet Connnolly and Jason Defreitas) were tasked with interviewing St. George. The remaining agents were forensic specialists whose job was to examine the computers and electronic devices targeted by the search warrant for seizure. Arlington police did not take part in the execution of the search warrant or the questioning of St. George.

2

early.   Tr. at 99.

2.   Agent Connolly introduced herself to St. George and explained that the officers were present to execute a federal search warrant.  She also stated that there would be an opportunity to discuss the warrant in a few minutes time.  Agent Connolly described St. George as nervous but calm.  Tr. at 19.[3]  She remained with St. George while explaining to him the purpose of the "protective sweep" of the home that the agents were about to undertake.[4]

3.   After concluding the "sweep," Agent Connolly and St. George were joined by Agent Defreitas who suggested that they interview St. George in the den adjoining the kitchen.[5]  Upon entering the den, St. George took a seat on the left side of a large sofa on the far wall of the den while the two agents

---

[3] St. George testified that as a concert pianist he had trained himself to project an induced aura of calm under stress, that "it's very much a performer's thing."  Tr. at 98.

[4] Agent Connolly testified that no questioning of St. George took place prior to his signing of the waiver while he was seated in the den.  Tr. at 35.  St. George testified that he and Connolly conversed during the ten minutes or so that they were together in the kitchen but that he could not recall the contents of anything said.  Tr. at 101, 102.  He also testified that he was confident that he had made no incriminating statements before signing the *Miranda* waiver.  Tr. at 108.

[5] Defreitas testified that he chose the den to avoid any interruption of the recording of the interview by the comings and goings of the search team.  St. George testified that he was the one who had suggested using the den.

seated themselves on kitchen chairs.[6]  No other agents were in the den and no weapons were drawn or visibly displayed.  Agents Connolly and Defreitas also removed the military-style ballistics vests they had worn when entering the house.

4.  Agent Connolly began the conversation by explaining to St. George that he was not under arrest and did not have to stay and speak with the officers, but that she wanted to discuss the circumstances of the warrant with him.  She also told St. George that he was free to leave if he so chose.[7]  She then produced a Statement of Rights (*Miranda*) form which she asked St. George to read and, if he was willing to speak, to sign.  After reading the form, St. George said, "My God, this is the *Miranda* warning.  This is exactly what they tell you never to sign," Tr. at 105, and that "I've got no one here to advise me."  Tr. at 106.[8]  Agent Connolly replied that "this isn't like what

---

[6] St. George testified that the seating arrangement gave him "a kind of claustrophobic feeling of being trapped."  Tr. at 103.  The contemporaneous photograph of the den introduced in evidence shows that, while the den is not spacious, a coffee table separated St. George from the agents with at least five or six feet between their respective positions.

[7] St. George does not dispute receiving the advice, only that he found any suggestion that he could leave "laughable" under the circumstances.  Tr. at 105.

[8] St. George also testified that he mumbled to himself that "I wish I could talk to a lawyer," and that while his voice was barely audible, the agents "should have been able to hear him."  Tr. at 106, 107.  I do not find this testimony credible.  *See* Tr. at 110-111.

4

you see on TV or in movies or read in books," and explained that the agents were simply seeking an assurance that he understood his rights before any questioning began.  Tr. at 42.  She also told St. George that he did not have to talk to them and could stop talking whenever he wished.  Tr. at 32-33. St. George then signed the *Miranda* waiver.  Ex. 5.[9]  At that point, Agent Connolly stepped out of the room to turn on a hidden cassette recorder to document the interview that followed.

5.  After discussing in general terms St. George's ownership and use of computers, Agent Connolly asked about his email accounts.  St. George volunteered the addresses of his public personal accounts and then added that he had a few anonymous accounts that he used to visit "porn" sites.  Tr. at 34.  This was the first time that the subject of pornography had been broached by any of the participants.  The interrogation lasted approximately one hour.  During the questioning, St. George agreed to allow the agents access to his email accounts and signed a permission form to that effect.  St. George testified that the agents' tone was consistently collegial and respectful.  Tr. at 115.  At no point during the interview was St. George handcuffed or physically restrained.  Nor did the agents object when St.

---

[9] St. George testified that he signed the form because he did not want "to appear to be obstructive," and because as "things had already started . . . it just seemed like the right thing to do, to sign it, and continue."  Tr. at 108.

George asked for a break to use the bathroom.

6. The entire process at St. George's home took a bit less than four hours. At the conclusion of the search, St. George was placed under arrest.

7. St. George is 73 years old. He has a college degree and has earned substantial post-graduate credit towards a Ph.D. at Brandeis University. He studied music at the Conservatory of Munich and taught music theory at Brandeis. At the time of his arrest, he was in his 45th year as the artistic administrator of the Boston Philharmonic Orchestra. During his last four years with the Boston Philharmonic, he taught aspiring musicians playing in the Philharmonic's youth orchestra.

## RULINGS OF LAW

1. The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." While "admissions of guilt by wrongdoers, if not coerced, are inherently desirable," *United States v. Washington*, 431 U.S. 181, 187 (1977), the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966), "presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his *Miranda* rights and freely decides to forgo those rights." *New York v. Quarles*, 467 U.S. 649, 654 (1984) (per

curiam). The *Miranda* rights warnings, while not constitutionally compelled, have a "constitutional underpinning." *Dickerson v. United States*, 530 U.S. 428, 440 n.5, 444 (2000).

    2. The voluntariness of a confession and the validity of a waiver are separate issues; a statement may be voluntary and yet not be the product of a knowing and intelligent waiver of a constitutional right. *Edwards v. Arizona*, 451 U.S. 477, 483-484 (1981). Conversely, a waiver may be informed and intelligent and an ensuing confession nonetheless involuntary. *See Withrow v. Williams*, 507 U.S. 680, 712 (1993) (O'Connor, J., dissenting in part) ("It is entirely possible to extract a compelled statement despite the most precise and accurate of warnings."). The test for determining whether a suspect has effectively waived his rights under *Miranda* has been stated as follows: "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). A "heavy" burden rests with the government to show a knowing and intelligent waiver of constitutional rights. *Tague v. Louisiana*, 444 U.S. 469, 470-471 (1980) (per curiam).

3. A custodial suspect who invokes the right to counsel at any time during an interrogation may not be questioned further until a lawyer is made available or unless the suspect himself initiates further communication with police. *Edwards*, 451 U.S. at 484-485. The invocation of the right to counsel, however, must be clear and unambiguous. While a suspect invoking *Edwards* "need not 'speak with the discrimination of an Oxford don' . . . he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994). A suspect's right to cut off questioning similarly must be "scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 104 (1975). But like the right to counsel, the privilege against self-incrimination is not self-executing; a witness who desires to claim its protections cannot simply stand mute but must in some affirmative sense invoke it. *Salinas v. Texas*, 570 U.S. 178, 186-187 (2013) (plurality opinion). In *Berghuis v. Thompkins*, 560 U.S. 370 (2010), the Court found "no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*." *Id*. at 381. Justice Kennedy, the author of the majority opinion, cited the same benefits inhering in a requirement

8

that an invocation of the *Miranda* right to silence be unambiguous as were posited in *Davis* – avoiding difficulties of proof and giving clear guidance to police.  *Id.*

4.  The voluntariness of a confession and the validity of a waiver are decided "in light of the totality of the circumstances."  *Procunier v. Atchley*, 400 U.S. 446, 453 (1971) (voluntariness); *North Carolina v. Butler*, 441 U.S. 369, 374-375 (1979) (waiver).  Relevant factors that courts have considered include promises or other inducements, the defendant's age; education; intelligence and emotional stability; his physical and mental condition; and the details of the interrogation, including its length, intensity, and any degree of trickery or deceit on the part of the interrogators.

5.  The *Miranda* duty to warn applies only to "custodial interrogation" and not to "[v]olunteered statements of any kind."  *Miranda*, 384 U.S. at 478.  Custodial interrogation is defined by *Miranda* as questioning (or its functional equivalent) "initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  *Id.* at 444.  *Miranda* warnings are required only when interrogation is "custodial."  "[T]he custodial setting is thought to contain 'inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not

otherwise do so freely.'"  *Minnesota v. Murphy*, 465 U.S. 420, 430 (1984), quoting *Miranda*, 384 U.S. at 467.  Custody, however, is not determined solely by the fact of a formal arrest.  The "ultimate inquiry" "is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam).  The determinative question is whether, considering all the circumstances, a reasonable person in the defendant's position would have believed that he was in custody.  *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).

6.   The custody test involves a variety of factors: (1) the place of the interrogation; (2) whether the investigation has begun to focus on the suspect, including whether there is probable cause to arrest the suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the suspect; and (4) whether, at the time the incriminating statement was made, the suspect was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave.  *Commonwealth v. Bryant*, 390 Mass. 729, 737 (1984); *see also United States v. Crooker*, 688 F.3d 1, 11 (1st Cir. 2012).   Other considerations include the duration of the detention, *United States v. Chamberlin*, 644 F.2d 1262, 1266-1267 (9th Cir. 1980); the

authority of officers to make an arrest, *United States v. Jamieson-McKames Pharm., Inc.*, 651 F.2d 532, 543 (8th Cir. 1981); the degree of restraint used to detain the suspect, *United States v. Booth*, 669 F.2d 1231, 1235-1236 (9th Cir. 1981); the extent to which a suspect is confronted with evidence of his guilt, *United States v. Estrada-Lucas*, 651 F.2d 1261, 1266 (9th Cir. 1980); and the number of officers involved in the detention and questioning, *United States v. Streifel*, 781 F.2d 953, 961 n.13 (1st Cir. 1986).

7. The more familiar or neutral the setting of the interview, the less likely it will be deemed to have a coercive overtone. *See Beckwith v. United States*, 425 U.S. 341, 347 (1976) (suspect's home); *Crooker*, 688 F.3d at 11 (same); *United States v. Familetti*, 878 F.3d 53, 60 (2d Cir. 2017) (bedroom of suspect's home); *United States v. Dockery*, 736 F.2d 1232, 1234 (8th Cir. 1984) (*en banc*) (suspect's place of employment); *Minnesota v. Murphy*, 465 U.S. 420, 433 (1984) (probation office).

8. The fact that a defendant has become the interrogator's "focus of suspicion" is irrelevant unless that suspicion is in some way communicated to the suspect. *Stansbury v. California*, 511 U.S. 318, 323-324 (1994) (per curiam); *Beckwith*, 425 U.S. at 346-347; *Beheler*, 463 U.S. at 1125. "A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how

11

a reasonable man in the suspect's position would have understood his situation." *Berkemer*, 468 U.S. at 442.  "Our cases make clear, in no uncertain terms, that any inquiry into whether the interrogating officers have focused their suspicions upon the individual being questioned (assuming those suspicions remain undisclosed) is not relevant for purposes of *Miranda*."  *Stansbury*, 511 U.S. at 326.

9.    The aggressiveness of the interrogation may determine whether the setting was custodial.  *See Beckwith*, 425 U.S. at 343 (conversation was "friendly," "relaxed," and "[un]press[ing]"); *United States v. Bassignani*, 560 F.3d 989, 996 (9th Cir. 2009) (two-and-one-half hour interview conducted in "an open, friendly tone"); *cf. United States v. Mumme*, 985 F.3d 25, 34 (1st Cir. 2021) (defendant was interviewed in his own backyard in a conversational fashion by two officers who never displayed weapons or issued threats of physical restraint).

10.   The fact that a suspect is told that he is free to terminate an interview at any time and depart unhindered is strong evidence that questioning was noncustodial.  "[T]he coercion inherent in custodial interrogation derives in large measure from an interrogator's insinuations that the interrogation will continue until a confession is obtained." *Murphy*, 465 U.S. at 433.  Finally, the fact that *Miranda* warnings are given

to a person not in custody "out of abundant caution" does not transform a noncustodial into a custodial interrogation. *Bryant*, 390 Mass at 737 n.8; *cf. Oregon v. Mathiason*, 429 U.S. 492, 493-495 (1977).

## CONCLUSIONS OF FACT AND LAW

1. As a matter of law, St. George was not in custody at the time he was questioned by Agents Connolly and Defreitas. Thus, no right to the *Miranda* warnings attached. The interview took place in the den of St. George's home. Although the hour was early, St. George testified that he was awake at the time the agents knocked, as he was expecting a taxi pick-up at 6:45 a.m. Only two agents were present for the questioning and, by the account of all the participants, the tone of the questioning was cordial and polite. The agents took care to remove their intimidating police vests and conceal their service weapons. Out of what I consider a (commendable) abundance of caution, St. George was given the *Miranda* warnings before any interrogation began and was told several times that he was free at any point to break off the questioning. No accusatory statements or threats were made by the agents, nor was St. George told that he was suspected of possessing child pornography until he volunteered the subject during the interview. At no point during the interview was St. George physically restrained, nor was he told that he could not leave the den before the

13

questioning had ended. St. George was permitted to use the bathroom when he requested permission of the agents to do so. And the entire interview was concluded within an hour.

    2. As a matter of law, St. George's statement in signing the *Miranda* waiver that "this is exactly what they tell you never to sign," did not amount to a clear and unambiguous invocation of his right to remain silent.[10]

    3. As a matter of fact, St. George's decision to sign the *Miranda* form, waive his rights, and proceed with the questioning was a voluntary one.[11] St. George is an intelligent and highly educated mature adult with worldly experience. As the recording of the interview reveals, his demeanor remained calm throughout the questioning, his answers to questions were responsive, while at the same time cautious and self-protective. As indicated before, the agents were polite, and as St. George acknowledges, collegial in their approach, and no deceptive or overbearing interrogation tactics were brought to bear.

---

[10] As previously indicated, I do not credit St. George's testimony that he attempted to assert a right to counsel, and therefore do not address that issue further.

[11] As previously noted, St. George testified that he understood the *Miranda* warnings as they were explained in the waiver form and came to the personal decision that cooperating with the police was "the right thing to do." Tr. at 108.

ORDER

For the foregoing reasons, St. George's motion to suppress is <u>DENIED</u>.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE